# 2001 DTA 97

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE SAN JUAN
PANEL IV**

GEORGINA CANDAL SEGUROLA
Apelada

v.

FRANCISCO ORSINI CAPO
Apelante

Núm. KLAN-00-00757

RECEIVED

AUG 2 3 2001

SERIALS DEPT
HARVARD LAW SCHOOL LIBRARY

San Juan, Puerto Rico, a 22 de enero de 2001

Panel integrado por su Presidente, Juez Gierbolini,
y los Jueces Cordero y Rodríguez Muñiz

Cordero, Juez Ponente

KGV
74
.A21995
v.7

## TEXTO COMPLETO DE LA SENTENCIA

Oportunamente, se nos solicitó la revisión de un dictamen del Tribunal de Primera Instancia con relación al aumento de una pensión alimentaria a favor de Georgina Candal Segurola (*"Candal"*) en representación de su hija María Isabel Orsini Candal (*"María Isabel"*).

### I

Francisco Orsini (*"Orsini"*) se acogió a un retiro voluntario del bufete Díaz Asencio, López & Orsini en el que tenía una participación minoritaria cuando el mismo se fusionó con Martínez, Odell & Calabria, el 1ro. de octubre de 1993. Para ese año Orsini recibió $128,000.00 en ingresos brutos. ■

Para fines de 1994, Orsini logró un acuerdo con el bufete Martínez, Odell & Calabria para prestar servicios en calidad de consultor en aquellos asuntos que específicamente se le refirieran hasta un máximo de 60 horas mensuales a base de una tarifa de $75.00 la hora.

En el año 1995, se decretó disuelto el matrimonio entre Orsini y Candal quien obtuvo la patria potestad y custodia de María Isabel a la que se le concedió una pensión alimentaria que Orsini debía pagar por la suma de $800.00 mensuales. Se dispuso, además, que los gastos de matrícula y educación de la menor, se pagarían de la cuenta conjunta que se creó durante el proceso del divorcio con el fin de depositar los ingresos que genera el capital ganancial, pendiente de liquidación. ■ Se concertó que la pensión alimentaria fijada en beneficio de la menor se revisaría en el término de un año y medio o cuando se liquidase la sociedad legal de gananciales, lo que ocurriera primero.

Desde el divorcio de las partes, Orsini solamente genera ingresos del contrato de servicios que sostiene con

Martínez, Odell y Calabria. Orsini admitió que desde su divorcio en 1995 no ha realizado gestiones para obtener otro empleo o colocación a pesar de no estar incapacitado para laborar a tiempo completo.

Desde diciembre de 1996 hasta julio de 1997, Candal y María Isabel informaron a Orsini los planes de estudios de la joven, quien finalmente comenzó estudios en la Universidad de Northeastern en Boston. [3] Ante esta situación, Orsini ofreció $100.00 mensuales adicionales al monto de la pensión de $800.00 que estaba pagando y se negó a utilizar los fondos de la cuenta entre él y Candal para sufragar los gastos de matrícula de la universidad de Northeastern. Orsini declaró que la menor podía recibir una educación universitaria a más bajo costo si estudiara en Puerto Rico.

Candal solicitó, el 8 de agosto de 1997, un aumento de pensión alimentaria a favor de María Isabel. Alegó, en síntesis, que la menor había sido aceptada a cursar estudios universitarios en la Universidad de Northeastern en Boston y que para cubrir los gastos anuales de dichos estudios resultaba necesario aumentar la pensión. Adujó, además, que Orsini contaba con los recursos económicos suficientes para sufragar una pensión alimentaria que permitiera que la menor cursara los estudios antes mencionados. Orsini se negó en varias ocasiones a descubrir prueba sobre su condición económica e indicó que sus ingresos limitados no le permitían sufragar una pensión alimentaria aumentada, ni todos los demás pagos necesarios para costear la asistencia de María Isabel a la Universidad de Northeastern. Posteriormente, se celebró la vista de aumento de pensión alimentaria. El Oficial Examinador emitió su informe, en el cual incorporó determinaciones de hechos y conclusiones de derecho, y recomendó al tribunal que emitiera resolución aumentando la pensión alimentaria a la suma de $1,706.00 mensuales.

El Tribunal de Primera Instancia adoptó íntegramente el informe de la Examinadora, dictando sentencia el 13 de julio de 1998. Orsini recurrió ante este Tribunal (KLAN-98-01030), y en esa ocasión se dispuso la devolución del caso al Tribunal de Primera Instancia para que se precisaran las determinaciones de hechos que sostenían el dictamen de aumento de pensión. Mientras el caso fue remitido nuevamente al Oficial Examinador, Candal ▉ tuvo que solicitar el pago provisional de una pensión con el fin de poder pagar lo adeudado a la universidad y lograr que se le permitiera a María Isabel matricularse para el último trimestre del año. El tribunal ordenó que se cargara el pago a la cuenta conjunta de los excónyuges, decretándose que en su día dicho pago sería asignado entre las partes de acuerdo al por ciento de participación en los gastos de educación que el tribunal determinase.

Finalmente, el 14 de febrero de 2000, se archivó en autos copia de la notificación de la segunda resolución del tribunal en la que se acogió íntegramente el primer y segundo informe del Oficial Examinador y determinó que procedía aumentarse la pensión alimentaria a $1,616.28 mensuales, más la suma de $3,000.00 por concepto de honorarios de abogado. ▉ En el Informe sometido por el Oficial Examinador se expresaron las siguientes determinaciones de hechos:

*"1. La promovente es mayor de edad, soltera y residente en Guaynabo, Puerto Rico, con la alimentista, María Orsini Candal.*

*2. Esta parte trabaja como Juez Superior en el Tribunal de Primera Instancia. Devenga un ingreso bruto mensual de $7,009.42 y neto de $4,713.74. En esta partida está incluido el bono de navidad y el reintegro contributivo.*

*3. Para los años 1991 al 1992, las partes y la menor fueron a residir a Boston, Massachusetts. Desde esa fecha, la menor expresó su interés en estudiar su bachillerato en Boston.*

*4. La joven María Orsini Candal estudió el verano de 1996 fuera de Puerto Rico. La parte promovente sufragó los gastos de estudios de la menor.*

5. Para el mes de diciembre de 1996, María solicitó ingreso a varias universidades. Esta escogió la Universidad de Northeastern, en Boston, Massachusetts.

6. El 21 de mayo de 1997, la parte promovente le escribió al promovido y le informó sobre los planes de María de estudiar en Boston, y éste no le contestó.

7. Para junio de 1997, el promovido le informó a la joven María que estaba de acuerdo con la orientación que iba a recibir en la Universidad de Northeastern y le envío $300.00.

8. Los gastos universitarios de María para la fecha de la vista eran aproximadamente $23,565.50 anuales. Al presente, María tiene unos gastos de matrícula por trimestre de $7,844, "Room" $1,470 y "Board" de $1,375. Estas partidas totalizan $10,689 por tres (3) trimestres; $32,067 anual. (Para los fines de hacer cómputos, sólo se consideró el nuevo ingreso de la parte promovente, de acuerdo a su nueva Planilla de Información Personal y Económica, no los gastos Universitarios informados en la misma.)

9. En adición (sic) a los gastos de universidad, María tiene gastos de espejuelos, lentes de contacto por la cantidad de $285 anuales, libros y materiales por la cantidad de $2,550 anuales, ropa y zapatos de invierno para ella y ropa de cama en la cantidad de $2,000 anuales, recortes cada 4 meses por la cantidad de $160, gastos personales y de entretenimiento por la cantidad de $1,800. Las necesidades de la alimentista al presente son de aproximadamente de $4,302.81 mensuales.

10. María tenía para la fecha en que se celebró la vista notas de B, B+, B-, y C+.

11. La parte promovente tiene al presente los mismos gastos de la hipoteca, mantenimiento, agua, luz y cable TV que tenía cuando la joven María residía con ésta permanentemente en Puerto Rico. Los gastos de teléfono han aumentado.

12. La parte promovida es abogado desde hace más de 30 años y se especializa en casos de banca y seguros. También atiende casos de daños y perjuicios, casos civiles y práctica apelativa. Trabajó con Zayas R. Puig cuyo principal cliente era el Banco Popular. También trabajó con Bauzá y Dávila.

13. Para el año 1993, el promovido recibió unos ingresos brutos de $128,000.00 anuales. Para esa fecha trabajaba más de 50 horas semanales. Para la fecha de la vista trabajaba 60 horas mensuales.

14. Aparte de los estudios de derecho, esta parte posee un Bachillerato en Administración Comercial. Estudió en Estados Unidos, Alabama, en escuela privada.

15. Al promovido se le consideró como gastos ordinarios de su negocio sólo la suma de $6,000, que es el 50% de la suma informada por éste, por considerar la subcribiente que el promovido también trabaja parte del tiempo en su casa. Así aparece en las Determinaciones de Hechos.

16. El promovido no asistió a la graduación de su hija de cuarto año, por ésta haberse alejado de la mamá de éste.

17. Las partes poseen en adición (sic) a sus ingresos, por razón de sus empleos, bienes muebles e inmuebles. Poseen además otros activos como GNMAS, IRAS, Maxi Premium. Veáse las Planillas de Información Personal y Económica presentadas por las partes.

18. Se hace formar parte del presente Informe de Determinaciones de Hechos del Informe de 29 de junio de 1998, algunas de las cuales hemos repetido."

Notificada la segunda resolución concediendo el aumento, Orsini procedió a radicar una moción sobre

determinaciones de hechos y conclusiones de derecho adicionales y moción de reconsideración. La primera fue replicada por Candal y finalmente fue declarada sin lugar por el tribunal. La moción de reconsideración fue en un principio declarada sin lugar por prematura, ya que aún estaba pendiente de adjudicarse la moción sobre determinaciones de hechos adicionales. Una vez se declaró sin lugar la moción de determinaciones de hechos adicionales, Orsini procedió a radicar una segunda moción de reconsideración que también fue declarada sin lugar en todos sus fundamentos, excepto en cuanto a la fecha de retroactividad del aumento de pensión.

Tras el incumplimiento de Orsini en el aumento de pensión alimentaria, se radicó una moción urgente de embargo y moción de desacato. Esta solicitud de embargo fue declarada sin lugar por el tribunal, pero se señaló vista en el asunto concerniente al desacato por parte de Orsini. En esta vista, Orsini acordó en corte abierta que el atraso de $4,897.68 más otra partida de matrícula se pagase, a cargo de la participación que tiene de la cuenta conjunta de la comunidad de los padres. Desde entonces, así se ha satisfecho mensualmente el pago del aumento de pensión.

## II

Orsini nos señala como errores del Tribunal de Primera Instancia, los siguientes:

*"Primero: Erró el Tribunal de Primera Instancia al suscribir y notificar una sentencia que viola las disposiciones de la constitución referentes al poder judicial.*

*Segundo: Erró el Tribunal de Primera Instancia al adoptar el informe de la examinadora de pensiones que actuó movida por prejuicio y parcialidad.*

*Tercero: Erró al no considerar y resolver el planteamiento del apelante de que a la luz de todas las circunstancias presentes, los gastos universitarios de la hija de las partes en la Universidad de Northeastern resultan excesivos, innecesarios e irrazonables.*

*Cuarto: Erró al fijar una pensión excesiva, injusta, y opresiva, que priva al apelante del derecho a atender su propio sostenimiento.*

*Quinto: Erró el tribunal al aplicar las guías mandatorias que violan la igual protección de las leyes y el debido procedimiento de ley.*

*Sexto: Erró al fijar honorarios de abogado excesivos e irrazonables."*

## III

Con relación al primer error señalado concerniente a que el tribunal violó las disposiciones de la constitución referente al poder judicial, entendemos que no le asiste la razón. Veamos.

Orsini arguyó que nuestra Constitución del Estado Libre Asociado dispone que el poder judicial se ejercerá por un Tribunal Supremo y aquellos otros tribunales que se establezcan por ley y sus jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado. Artículo V, secciones 1 y 8. Indicó como parte de su argumentación que la Ley Especial de Sustento de Menores ("*LESM*") dispone el nombramiento por el Juez Presidente de suficientes Examinadores para presidir las vistas sobre pensiones alimentarias y filiación. 8 L.P.R.A. sec. 512. Orsini correctamente argumenta que esos funcionarios, aunque no desempeñan una labor judicial propiamente, tienen facultad para recibir la prueba que tenga a bien someter las partes, formular determinaciones de hechos, conclusiones de derecho y rendir un informe al juez conteniendo sus recomendaciones. *In re: Pérez Abreu*, __ D.P.R. __ (4 de octubre de 1999), **99 J.T.S. 151**, a las págs. 115-116. La función que llevan a cabo los examinadores, resulta ser indispensable para la buena administración de la justicia en un área tan importante como lo es el Sustento de Menores. *In re: Pérez Abréu, supra,* a las págs. 115-116.

El cargo de Oficial Examinador de Pensiones Alimenticias surge con la creación de LESM. Esta ley tuvo como propósitos unir e integrar en un sólo y único cuerpo, independiente y separador de la Ley Orgánica del Departamento de Servicios Sociales, procedimientos que agilizaran y ayudaran a garantizar a los niños de este país el pago de su pensión alimenticia, una vez fijada o establecida, así como la recaudación y distribución de éstas. Véase la Exposición de Motivos, LESM, 8 L.P.R.A. sec. 501 *et seq.*

LESM contempla, en lo pertinente, la función de estos examinadores en 8 L.P.R.A. sec. 517(5):

*"El informe de un Examinador incluirá determinaciones de hechos, conclusiones de derecho y recomendaciones sobre la pensión alimentaria, el cual será referido al Tribunal de Primera Instancia. El juez del Tribunal de Primera Instancia podrá hacer suyas las determinaciones, conclusiones y recomendaciones del Examinador o hacer sus propias determinaciones de hechos o conclusiones de derecho con o sin vista previa y emitir la orden, resolución o sentencia que corresponda...".* Veáse Sarah Torres Peralta, *La ley especial de sustento de menores y el derecho de alimentos en Puerto Rico*, ed. Especial 1997, Puerto Rico, Publicaciones STP, Inc., a la pág. 4.32.

Orsini alegó que el Juez del Tribunal de Primera Instancia no tuvo la oportunidad de evaluar, con criterio propio e independiente, la razonabilidad de las determinaciones de hechos, conclusiones de derecho y recomendaciones del Oficial Examinador, ya que se informó por éste al tribunal que la prueba documental se había extraviado y que las determinaciones de hechos eran el producto de sus notas y de una nueva planilla presentada por Candal. No obstante, le debemos recordar a Orsini que la LESM hace mandatorio que se levante un récord de la vista, garantía que es inherente al debido proceso de ley. Estos procedimientos ante el examinador son grabados y se levanta récord, igual que cuando se litiga en el foro judicial directamente. Sarah Torres Peralta, *supra*, a la pág. 4.31. Por lo que está disponible para ser examinado por el Juez, quien determina si acoge o no el informe presentado por el Oficial Examinador y quien determina la necesidad de una vista antes de emitir la orden, resolución o sentencia que corresponda. La comprobación la puede hacer el juez de modo informal en su despacho o mediante vista evidenciaria, según estime que mejor adelantan los principios tutelares de protección de menores y economía procesal. En el caso ante nos, simplemente el Juez optó válidamente por acoger el informe presentado por el Oficial Examinador, lo que no constituye una violación a las disposiciones constitucionales referentes al poder judicial.

## IV

El segundo error consiste en determinar si el Tribunal de Primera Instancia erró al adoptar el informe de la examinadora de pensiones que alega Orsini actuó movida por prejuicio o parcialidad. Tampoco le asiste la razón.

Orsini fundamentó su alegación de error en que la falta de imparcialidad de la examinadora queda evidenciada en las determinaciones de hecho 6 y 16. Las mismas lo que establecen respectivamente como hechos es que Candal informó a Orsini, mediante carta, los planes de María Isabel de estudiar en la Universidad de Northeastern y Orsini no le contestó, además, indicó la examinadora que Orsini no asistió a la graduación de su hija. Alegó Orsini que la determinación #7 claramente indica que él estaba de acuerdo con la orientación en la referida Universidad por lo que aportó $300.00. Alegó, entre otras cosas, que no se celebró vista, ni se brindó oportunidad a las partes de presentar nueva prueba ■ posterior a que este Tribunal devolviera el caso al Tribunal de Primera Instancia para que se precisaran las determinaciones de hechos que sostenían el dictamen de aumento de pensión.

Evidentenente, de los argumentos en los que Orsini sostiene el alegado error, se denota la insatisfacción con la manera o estilo en que la oficial Examinadora redactó sus determinaciones de hechos y enfatizó alguno de los mismos. Incluso indició que la examinadora omitió presentar *"todos los hechos"* que configuran una determinación o evento, lo que para él dio lugar a la presentación *"limitada y acomodaticia"* de los mismos.

El hecho de que el informe de la examinadora no resulta favorable a Orsini no es resultado de prejuicio, error, pasión o parcialidad. La examinadora consideró en todo momento la información suministrada por las partes de manera que el ingreso atribuido a Candal resultó ser mayor al del apelante. No obstante, del propio informe de la examinadora surge con claridad, como muestra de la falta de prejuicio o parcialidad, que en la determinación #8 se indicó:

*"Los gastos universitarios de María, para la fecha de la vista, eran aproximadamente $23,565.50 anuales. Al presente, María tiene unos gastos de matrícula por trimestre de $7,844, 'Room' $1,470 y 'Board' de $1,375. Estas partidas totalizan $10,689 por tres (3) trimestres; $32,067 anual. (Para los fines de hacer cómputos, sólo se consideró el nuevo ingreso de la parte promovente, de acuerdo a su nueva Planilla de Información Personal y Económica, no los gastos Universitarios informados en la misma.)"*

Una inspección de las determinaciones esbozadas por la examinadora demuestra en forma específica los extremos que sostienen su conclusión de aumentar la pensión alimentaria. Nuestro Tribunal Supremo ha expresado a este aspecto que *"no se requiere que en las decisiones se incluyan detalles innecesarios y minuciosos..."*. *Torres García v. Dávila Díaz y Otros*, __ D.P.R. __ (22 de febrero de 1996), **96 J.T.S. 19**, a la pág. 690. La examinadora desglosó las partidas que corresponde a la pensión básica según la tabla, proporción de gasto de vivienda y de educación. Además de señalar el ingreso atribuido a las partes y considerar como gasto ordinario del negocio de Orsini el 50% de la suma por él informada, no obstante, en el escrito presentado por éste indica que su único ingreso es el generado en su acuerdo con Martínez, Odell & Calabria, firma que le provee espacio de oficina y servicio de secretaria para sus trabajos. De los argumentos expresados por Orsini concluimos que ni la examinadora, ni el juez del Tribunal de Primera Instancia, actuaron con pasión o prejuicio que pongan en condiciones a este Tribunal de intervenir con la apreciación de la prueba presentada. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985).

## V

El tercer y cuarto señalamiento, los analizaremos conjuntamente. El tercer error que se trae ante nuestra consideración consiste en considerar y determinar si erró el foro *a quo* al no resolver que los gastos universitarios de la hija de las partes en la Universidad de Northeastern resultan excesivos, innecesarios e irrazonables. El cuarto error apunta a que la pensión es excesiva, injusta y opresiva, que priva a la parte a atender su propio sostenimiento. Tampoco le asiste la razón.

Nuestra jurisprudencia ha reconocido que el derecho reclamar alimentos, es parte del derecho a la vida, es uno de profundas raíces constitucionales. Reiteradamente se ha señalado que, en nuestra jurisdicción, los menores tienen un derecho fundamental a reclamar alimentos, que los casos relacionados con alimentos de menores están revestidos del más alto interés público, y que en éstos, el interés no puede ser otro que el bienestar del menor. *Negrón Rivera y Bonilla Ex Parte*, 120 D.P.R. 61, 71-72 (1987). La obligación del sustento de los hijos menores recae en ambos padres. Sin embargo, una vez roto el vínculo matrimonial, se reparte entre los padres el pago de la pensión alimentaria en cantidad proporcionada a su caudal respectivo. Código Civil, Artículo 145, 31 L.P.R.A. sec. 564; *López Martínez v. Yordán*, 104 D.P.R. 594, 597 (1976).

En el presente caso, la obligación de alimentar surge del Artículo 143 del Código Civil, 31 L.P.R.A. sec. 562:

*"Están obligados recíprocamente a darse alimentos, en toda la extensión que señala la sec. 561 de este título:*

*(1) Los cónyuges*

*(2) Los ascendientes y descendientes*

7

*(3) El adoptante y el adoptado y sus descendientes.*

*Los hermanos se deben recíprocamente, aunque sólo sean uterinos, consanguíneos o adoptivos, los auxilios necesarios para la vida, cuando por un defecto físico o moral, o por cualquier otra causa que no sea imputable al alimentista, no puede éste procurarse en subsistencia. En estos auxilios están, en su caso, comprendidos los gastos indispensables para costear la instrucción elemental y la enseñanza de una profesión, arte u oficio."*

Nuestro Código Civil, a su vez, define lo que se va a entender como alimentos:

*"Se entiende por alimentos todo lo que es indispensable para el sustento habitación, vestido, asistencia médica, según la posición social de la familia.*

*Los alimentos comprenden, también, la educación e instrucción del alimentista, cuando es menor de edad."*

En el citado artículo 143, *supra*, se trata de una obligación alimentaria, en el caso del padre o la madre de hijos no enmancipados que no viven en su compañía y sobre los cuales no tienen patria potestad, y a hijos y otros parientes, no importa su edad que tengan necesidad de alimentos, y siempre que el alimentante cuente con recursos para proveerlos. Este se basa en el estado de necesidad del hijo y depende de la condición del padre o madre alimentante. Se requiere en estos casos que el menor tenga necesidad de una pensión alimentaria; esta obligación no cesa *ipso facto* con la enmancipación del menor, ni aún cuando llega a los 21 años. Se extiende o se puede extender después del hijo llegar a la mayor edad, lo que puede ocurrir, por ejemplo, cuando se trata de la obligación de educar al alimentista menor de edad para que éste termine su carrera universitaria aún después de llegar a la mayoría de edad, si fue comenzada cuando aún era menor de edad como en el presente caso. *Guadalupe Viera v. Morell*, 115 D.P.R. 4, 13 (1983); *Key Nieves v. Oyola Nieves*, 116 D.P.R. 261, 266 (1985).

Recientemente, el Tribunal Supremo expresó que:

*"Independientemente de lo expresado a través de nuestra jurisprudencia en torno a las fuentes de las cuales emana la obligación de alimentar, la obligación de alimentar a los hijos menores es resultado de la relación paterno-filial y surge desde el momento en que la paternidad o maternidad quedan establecidos legalmente. Esto quiere decir que el padre y la madre legalmente establecidos como tales, tengan o no la patria potestad o vivan o no en compañía de sus hijos menores, están obligados a velar por éstos y a proveerles alimento. El derecho de los menores a reclamar alimento, la obligación de los padres de proveerlos y la interpretación de los tribunales para concederlos, deben estar enmarcados en la relación paterno-filial legalmente establecida, no supeditada a uno u otro artículo del Código Civil. Claro está, la cuantía de pensión alimentaria se fijará tomando en consideración, no sólo la necesidad de los hijos menores de edad, sino también la condición socio-económica del padre alimentante." Chévere v. Levis*, __ D.P.R. __ (2000), **2000 J.T.S 56**, a la pág. 850.

Orsini, durante la vista ante el Oficial Examinador, formuló el planteamiento concerniente al gasto de estudios universitarios incurridos por su hija al cursar estudios en la Universidad de Northeastern en Boston. La Examinadora expresó que no iba a considerar el planteamiento. Orsini argumenta que esta determinación por parte de la Examinadora le privó del debido procedimiento de ley. Orsini trató durante la vista presentar evidencia de una porción de una versión de Internet de U.S. News & World Report, America's Best 1998 Colleges con la expectativa de establecer que la universidad donde estudia su hija es una mediocre. Indicó que como la publicación circula en Puerto Rico y en ocasiones es usada por aquéllos que contemplan cursar estudios en Estados Unidos, la información obtenida a través de Internet resulta estar rodeada de suficientes garantías de confiabilidad para que la Examinadora tomara conocimiento judicial y admitiera la prueba. De esta forma, Orsini pretendía establecer que ante los estudios *"comunes, ordinarios y frecuentes"* que cultiva su hija sin *"necesidad"* de que sean fuera de Puerto Rico existen diversas universidades de *"calidad comparable o superior"* a la Universidad de Northeastern con un costo sustancialmente menor. Arguyó que la *"preferencia o deseo, inclusive capricho"* de su hija, no puede servir de base para fijar la pensión alimentaria que él debe

pagar. En cuanto a este argumento, Orsini tiene cierta razón, ya que el *"capricho"* de un hijo por sí sólo, no puede ser el factor determinante donde se debe cursar los estudios. Al contrario, el *"capricho"* de un padre, por sí sólo, no puede servir de base para privar a una hija de una mejor educación dentro de los medios económicos de ambos padres. En el caso ante nos, la madre también tiene que sufragar los gastos y ésta, sin duda alguna con la ayuda de su hija, concluyó que la Universidad de Northeastern era la escuela adecuada para que la niña culminara sus estudios. El balance racional, por tal razón, se inclina a confirmar la posición fijada por el foro recurrido.

Orsini indicó que no está en una condición económica que permita incurrir en tales gastos excesivos. Considera Orsini que la pensión fijada es excesiva, injusta y opresiva, ya que no se redujo su ingreso por la totalidad de los gastos operacionales, sino por sólo la mitad de éstos. Objeta el hecho de que la Examinadora indicara que el apelante tiene tiempo y capacidad para devengar mayores ingresos cuando él se había retirado antes del divorcio y en común acuerdo con Candal.

Debemos recordar que en el concepto de alimentos incluye la educación e instrucción del alimentista. Como señalamos anteriormente, el derecho de los menores a reclamar alimentos debe estar enmarcado en la relación paterno-filial legalmente establecida no supeditada a uno u otro artículo del Código. *Chévere, supra.* La educación constituye un factor indispensable para el desarrollo y formación de los hijos del que todo padre debe estar orgulloso.

Para la determinación de la cuantía de la pensión alimentaria que el alimentante deberá pagar al alimentista, se consideran los recursos y medios de fortuna del alimentante, de forma tal que se pueda determinar su capacidad económica para cumplir su obligación alimentaria hacia el alimentista y las necesidades del alimentista para cubrir sus necesidades de sustento, habitación, vestido, asistencia médica y para su instrucción o educación, tomando en cuenta su posición social. Sarah Torres Peralta, *supra*, a la pág. 2.1.

Por su parte, el artículo 146, 31 L.P.R.A. sec. 565, establece que:

*"La cuantía de los alimentos será proporcionada a los recursos del que los da y a las necesidades del que las recibe, y se reducirán y aumentarán en proporción a los recursos del primero y a las necesidades del segundo."*

A los fines de determinar el montante de los recursos del alimentante, hay que hacer una determinación de sus ingresos más el montante de su capital; es decir, se determinará el montante de su patrimonio total. El patrimonio total del alimentante será el punto de partida para determinar su capacidad económica para descargar su obligación alimentaria. 8 L.P.R.A. sec. 518.

La determinación respecto a la capacidad económica del alimentante y a la necesidad del alimentista es siempre una cuestión de hecho que queda generalmente al juicio prudente y a la discreción del juzgador. *Guadalupe Viera v. Morell, supra.* Para hacer tal determinación, el tribunal no está limitado por la prueba documental y oral que recibe en la vista. Puede recurrir a evidencia circunstancial, tomar en cuenta el estilo de vida del alimentante y también la realida de la economía subterránea que prevalece en Puerto Rico. *Gabriela López v. Ernest Rodríguez*, 121 D.P.R. 23, 31-33 (1988). Con relación a la forma de determinar la capacida económica del alimentante, Sarah Torres Peralta, *supra*, a la pág. 2.2, señala:

*"La determinación en cuanto a la capacidad económica del alimentante y la necesidad del alimentista, es siempre una cuestión de hecho que queda siempre al juicio prudente y discreción del juzgador. Para hacer tal determinación, el Tribunal no está limitado por la prueba documental y oral que recibe en la vista. Puede recurrir a evidencia circunstancial, tomar en cuenta el estilo de vida del alimentante y también la realidad de la economía subterránea que prevalece en Puerto Rico. El llegar a esa determinación, no es cosa fácil. Requiere hacer un fino balance de toda la evidencia que se presenta y llegar a la determinación correspondiente con una gran sensibilidad y sentido social, ya que está envuelto nada menos que el bienestar de los niños."*

La LESM reconoce, en su artículo 2(17), 8 L.P.R.A. sec. 501(17), las deducciones permitidas para el cómputo

del ingreso neto como las contribuciones sobre ingresos, seguro social, y otras requeridas mandatoriamente por ley, las deducciones por concepto de planes de retiro, asociaciones, uniones y federaciones voluntarias, así como los descuentos o pagos por concepto de primas de pólizas de seguros de vida contra accidentes o de servicios de salud cuando el alimentista sea beneficiario de éstos. Esta determinación de las deducciones que corresponde a cada una de las partes, se hace según la prueba disponible, incluyendo estimados, proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente. En el caso de los alimentantes con ingresos generados por cuenta propia, se pueden descontar las cantidades que para propósito de la planilla de contribución sobre ingresos, se permite deducir como gastos ordinarios y necesarios. En el caso de marras, ya discutimos el hecho de que Martínez, Odell & Calabria le proveyó a Orsini el espacio de oficina, teléfono, biblioteca y servicios secretariales libre de costo, por lo que la Examinadora atribuyó sólo el 50% de los gastos reportados por Orsini como aquellos necesarios a la labor que realizaba desde su hogar. En el caso ante nos, el patrimonio total de Orsini incluye la comunidad de bienes de las partes, bienes muebles de acciones, inversiones y depósitos que ascienden a cerca de medio millón de dólares, y que generó para el 1997 un ingreso de más de $20,000.00.

Por otra parte, la determinación de la Examinadora de que Orsini tiene capacidad para generar más ingresos va dirigida a reducir, sino a eliminar las defensas de que no está generando ingresos suficientes. Es importante en estos casos de alimentos tomar en cuenta la aptitud para tener ingresos considerando la preparación académica, la capacidad física e intelectual para trabajar y la naturaleza de las profesiones. Sarah Torres Peralta, *supra*, a las págs. 2.28-2.29, expresa:

*"Más rutinario es el caso del profesional que devengaba $2,000 ó $2,500 mensuales y en anticipación de la separación y divorcio, toma medidas efectivas para renunciar al trabajo, a veces informando que fue por acuerdo con su esposa o por decisión unilateral...*

*En otras ocasiones, el alimentante con oficina propia -abogados, médicos, ingenieros, consultores, mecánicos y muchos otros-, y también en anticipación de los rigores de los procedimientos alimentarios, proceden a vender su participación en la oficina, a reducir sus ingresos en forma sustancial (toman menos casos, cobran menos honorarios, atienden menos pacientes), y de esa forma la pensión alimentaria a regir sería sustancialmente menor a las partidas de alimentos que el mismo alimentante cubría antes de la separación y el divorcio."*

Las determinaciones del foro que tuvo la oportunidad de escuchar y apreciar la prueba merecen deferencia y un Tribunal en alzada no debe sustituirlas, salvo que se demuestre prejuicio o error manifiesto, ausentes en el caso ante nos. *Flores Santiago v. Domínguez*, (30 de junio de 1998), **98 J.T.S. 96**, pág. 1354.

## VI

El quinto error señalado es el relacionado con la aplicación de las guías mandatorias y la violación del debido proceso de ley e igual protección de las leyes. No le asiste la razón.

Existen unas guías mandatorias para la fijación y modificación de pensión alimentaria en Puerto Rico con aplicación mandatoria y uniforme por los jueces y funcionarios encargados de las adjudicaciones alimentarias que envuelven alimentistas menores de edad e incapacitados. 8 L.P.R.A. sec. 518. La pensión alimentaria resultado de la aplicación de las guías mandatorias, está revestida por una presunción de corrección. Por tanto, la parte que ataque la aplicación de las guías, tendrá el peso de probar que la pensión resultante de la aplicación de las guías en la situación de que se trate redunda en un resultado injusto e inadecuado. Deberá presentar evidencia pertinente, usualmente, sería necesaria prueba pericial para enfrentarse al estudio económico que le sirvió de base a las Guías vigentes o para establecer que el resultado es injusto en las circunstancias. Sarah Torres Peralta, *supra*, a la pág. 9.5.

De rebatirse la presunción, la cuantía se determinará a base de todos los criterios pertinentes, algunos de los cuales están enumerados en 8 L.P.R.A. sec. 518: (1) los recursos económicos de los padres y del menor; (2) la salud física y emocional del menor, y sus necesidades y aptitudes educacionales o vocacionales, (3) el nivel de

vida que hubiera disfrutado el menor si la familia hubiera permanecido intacta, (4) las consecuencias contributivas para las partes, cuando ello sea práctico y pertinente, (5) las contribuciones no monetarias de cada padre al cuidado y bienestar del menor, (6) economía subterránea, (7) estilo de vida, y (8) clase y productividad de los bienes del alimentante. Sarah Torres Peralta, *supra*.

Orsini no logró rebatir la presunción de corrección de la aplicación de las guías mandatorias, por lo que este Tribunal entiende que las mismas son de aplicación al presente caso. Alegó someramente que violan la igual protección de las leyes al permitir la deducción de retiro del empleado gubernamental; sin embargo, la deducción por retiro se permite a cualquiera de las partes que provea tal información, ya que los planes de retiro en particular sean del Estado o sean de la empresa privada, o por concepto de inversiones para retiro, son de especial importancia. Los pagos en concepto de planes de retiro, ya sean de empresa privada o planes de gobierno, son deducibles del ingreso bruto para fines de calcular la pensión alimentaria. Debe recordarse que es política pública promover los planes de retiro y conservar los derechos del beneficiario de dicho plan sin poner en peligro su participación en el mismo. Sarah Torres Peralta, *supra*, a la pág. 2.10. Sencillamente, Orsini nunca mostró evidencia indicativa de los desembolsos a ningún plan de retiro.

## VII
Por último, el error señalado sobre los honorarios de abogados excesivos e irrazonables, carece de méritos.

Conforme a la LESM, 8 L.P.R.A. sec. 521, dispone en lo pertinente que:

*"(1) En cualquier procedimiento bajo esta Ley para la fijación o modificación de una pensión alimentaria, el Tribunal, el Administrador o el Juez Administrativo, deberá imponer al alimentante el pago de honorarios de abogado a favor del alimentista cuando éste prevalezca."*

En los casos de alimentos a menores de edad, como vemos, la temeridad no es pertinente, éstos surgen de un mandato expreso de la LESM. Los honorarios de abogado forman parte de los alimentos a que tienen derecho los hijos menores de edad, en virtud del artículo 142, *supra*, aun cuando se concluya que no hubo temeridad al litigar el caso. *Valdés v. Tribunal de Distrito Judicial de San Juan*, 67 D.P.R. 310, 313 (1947); *Guadalupe Viera v. Morell*, 115 D.P.R. 4, 14 (1983); *In re: Pabón García*, 118 D.P.R. 723, 729 (1987).

Nuestro Tribunal Supremo ha señalado que al momento de fijar la cuantía de los honorarios de abogado, el juez debe tomar en cuenta los siguientes factores:

*"...la naturaleza del litigio; las cuestiones de Derecho envueltas en el mismo; la cuantía en controversia; el tiempo invertido; los esfuerzos y actividad profesional que hayan tenido que desplegarse; y la habilidad y reputación de los abogados envueltos." Feliciano Polanco v. Feliciano González y Otros*, __ D.P.R. __ (1999), **99 J.T.S. 23**, a la pág. 653.

La cuantía impuesta por el foro *a quo* se sustenta a la luz de que el presente caso lleva más de tres años en litigación, donde se han celebrado múltiples vistas, se han presentado múltiples escritos ante el Tribunal de Primera Instancia y recursos ante este Foro y el Tribunal Supremo de Puerto Rico.

## VIII
Por los fundamentos anteriormente expresados, confirmamos la sentencia del Tribunal de Primera Instancia.

Lo acuerda y manda este Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

1. $45,000.00 de salarios por nueve meses, a razón de $5,000.00 mensuales y $83,000.00 de ganancias acumuladas y distribuidas antes de la fusión.

2. Para ese entonces, el costo total de la Academia María Reina donde estudiaba la menor ascendía a $4,200.00 (matrícula y mensualidades). El caudal en comunidad de bienes entre las partes asciende aproximadamente a medio millón dólares.

3. Se consideró para la elección de la Universidad, los intereses de la menor, ofrecimientos académicos y de internados, así como el nivel de vida a que estaba acostumbrada, el patrimonio de los padres de la menor y la capacidad de éstos de generar ingresos. María Isabel cursa estudios en ciencias sociales (bachillerato en artes) con una concentración en sicología.

4. Mediante Informe Suplementario sometido a la Examinadora de Pensiones, informó Candal de un aumento salarial, lo que conllevó a ajustar su ingreso bruto mensual a $7,009.42 y el neto a $4,713.74.

5. Desde el 7 de febrero de 2000, antes de notificarse esta segunda resolución, compareció María Isabel Orsini Candal, quien ya había cumplido los 21 años. María Isabel adoptó y se subrogó en los planteamientos que sobre el aumento de pensión había hecho anteriormente su madre.

6. Del Apéndice presentado ante este Tribunal, surge que en escrito de *"Oposición a solicitud de documentos suplementarios presentada por la parte demandante y solicitud de 'status conference'"*, Orsini se opuso a someter evidencia relacionada a sus planillas sobre contribución de ingresos para los años 1997 y 1998.